# Exhibit A



1  JOHN L. BURRIS, ESQ., (SBN 69888)
   NA'IL BENJAMIN, ESQ., (SBN 240354)
2  LAW OFFICES OF JOHN L. BURRIS
   7677 OAKPORT ST., SUITE 1120
3  OAKLAND, CA 94612
   Telephone: (510) 839-5200
4  Facsimile:  (510) 839-3882
   John.Burris@johnburrislaw.com
5  nbenjamin@benjaminlawgroup.com

6

7  BENJAMIN LAW GROUP, P.C.
   NA'IL BENJAMIN, ESQ., (SBN 240354)
   ANN M. KARIUKI, ESQ. (SBN 283306)
8  505 14th ST., SUITE 900
   OAKLAND, CA 94612
9  Telephone: (510) 710-3585
   Facsimile:  (415) 349-3334
10 nbenjamin@benjaminlawgroup.com
   ann@4blglaw.com

11

12

13 Attorneys for Plaintiff
   CARMEN GUZMAN

14

15         SUPERIOR COURT OF THE STATE OF CALIFORNIA

16            FOR THE COUNTY OF ALAMEDA

**ENDORSED
FILED
ALAMEDA COUNTY**

DEC 3 1 2015

CLERK OF THE SUPERIOR COURT
By MARGARET J. DOWNL
                          Deputy

| | |
|---|---|
| CARMEN GUZMAN, an individual | CASE NO. RG15797471 |
| Plaintiff, | PLAINTIFF'S COMPLAINT FOR: |
| v. | 1. **GENDER DISCRIMINATION (FEHA);** |
| MADISON VINEYARD HOLDINGS, LLC, a Limited Liability Corporation, dba, JAMIESON RANCH VINEYARDS; and DOES 1 - 100, inclusive, | 2. **RACIAL HARASSMENT (FEHA);** 3. **RACIAL DISCRIMINATION (FEHA);** 4. **DISABILITY DISCRIMINATION (FEHA);** 5. **RETALIATION (FEHA);** |
| Defendants. | 6. **RETALIATION AND HARASSMENT (CFRA); AND** 7. **WRONGFUL TERMINATION (PUBLIC POLICY)** |
| | **DEMAND FOR JURY TRIAL** |

**FILE BY
FAX**

-1-

PLAINTIFF'S COMPLAINT                          CASE NO.

## SUMMARY OF CLAIMS

1.      This is an action for damages by Plaintiff CARMEN GUZMAN ("Plaintiff" or "Guzman") against her former employer, MADISON VINEYARD HOLDINGS, LLC, a Limited Liability Corporation, dba, JAMIESON RANCH VINEYARDS ("Jamieson"), for a pattern of tortious conduct, involving multiple violations of the Fair Employment and Housing Act and the California Family Rights Act, including harassment and discrimination on the basis of Ms. Guzman's medical condition, race, and sex.  Plaintiff seeks compensatory damages including general damages for mental and emotional distress, special damages, consequential damages, punitive damages, and statutory attorney's fees.

## PARTIES

2.      At all relevant times, Ms. Guzman worked at Jamieson Ranch Vineyards in American Canyon, California, in the County of Napa, State of California.

3.      Plaintiff is informed and believes, and based on such information and belief, that at all relevant times, Defendant was and now is a limited liability company doing business under the laws of the State of California, with its principal place of business being in American Canyon, California.

4.      The true names and capacities of Defendants sued herein as Does 1 through 100, inclusive, are unknown to Plaintiff, but Plaintiff will amend this Complaint when and if the true names of said Defendants become known to her.  Plaintiff is informed and believes and based thereon alleges that each of the Defendants sued herein as a Doe is responsible in some manner for the events and happenings herein set forth and proximately caused injury and damages, and any reference to "Defendant" shall mean "Defendant and each of them."

///

-2-

5.     Plaintiff is informed and believes and based thereon alleges that each Defendant was the agent and employee of its Co-Defendants, and in doing the things alleged in this Complaint was acting within the course and scope of that agency and employment.

## FACTUAL BACKGROUND

6.     Ms. Guzman is a professional chef that came to Jamieson through a temp agency. Although Jamieson accepted the assignment of Ms. Guzman in March 2013 as a temporary Sous Chef, it did not take long for her to realize that she would not be welcomed with open arms.

7.     On her first day of work, as Ms. Guzman was sitting in the waiting room, she overheard Jamieson's Vice President, Bill Spear, disrespect African Americans behind closed doors.  Spear was in an apparent discussion with someone else in the room, and she heard him say: "Fucking black people!"  Both Spear and this other person began to laugh as they continued their high-spirited discussion without knowledge or compassion for the African American outside of the room that had just heard this comment.

8.     Apparently, that incident was neither the first time, nor last time, Spear made disrespectful comments about African Americans.  Fortunately, on this occasion, at least one other employee observed the fact that Ms. Guzman heard Spear's comment.  That employee's embarrassment not only confirmed that the employee heard the same disrespectful comment, but it later validated Ms. Guzman's conclusion that the experiences she later suffered stemmed from racism and the intent to make it known that she was not valued at Jamieson as a person or a professional.

9.     Ms. Guzman's qualifications and skills as a chef are extremely competitive and desirable in any kitchen.  She graduated with honors from Le Cordon Bleu College of Culinary Arts and has worked as a chef for several prestigious companies.  Even still, Jamieson would not initially hire Ms. Guzman as a permanent Sous Chef.  For no good reason, they wanted her to remain on assignment from the temp agency earning an hourly rate of $17.

-3-

10.      Hesitantly, Jamieson hired Ms. Guzman in August 2013 as a permanent Sous Chef. Brian Overhauser, a white male, was the Executive Chef at that time. However, Overhauser forced Ms. Guzman to perform his Executive Chef duties while paying her as only a Sous Chef. She began performing these duties almost immediately upon being hired.

11.      Jamieson subsequently fired Overhauser. It then informed Ms. Guzman that she was being given a "chef position" as a promotion. But Jamieson neither anointed her with the title of executive chef, nor a salary commensurate with her skill and responsibility. Instead, she was required to continue performing Overhauser's job duties as an Executive Chef without enjoying the benefits and title of an Executive Chef. Indeed, being a female African American Executive Chef in Napa was trailblazing. As such, she was entitled to the same salary as her Caucasian predecessor: Overhauser made more than $100,000 annually, but Jamieson continued to pay Ms. Guzman only $43,000 annually. This extreme disparity violates the Equal Pay Act, as well as several state and federal laws.

12.      Ms. Guzman was overworked and and underpaid. It was a policy at Jamieson that anyone employed in a management position would receive a Christmas bonus. This did not happen for Ms. Guzman. Instead she was given an excuse that they would push her bonus back to the New Year. Ms. Guzman did not see a cent and her salary never increased.

13.      As the "Chef" at Jamieson, Ms. Guzman developed a clearer understanding of the distinctions in treatment for Caucasian and non-Caucasian employees. For example, Ms. Guzman's requests for vacation days were unreasonably denied, but she observed Caucasian employees approved for vacations without the same probing and resistance she experienced. Ms. Guzman observed the attitudes, actions, interactions, communication styles, and other workplace behaviors that were common at Jamieson. So when she was forced to terminate a Latino Sous Chef because of so-called "attitude problems," she knew that Caucasian employees with much worse workplace

-4-

behavior had not been similarly fired or even reprimanded for their workplace actions.  More importantly, however, Ms. Guzman knew that this Latino employee had not behaved in any manner that warranted termination.

14.     This disparate treatment seemed to have no limits.  Things took a turn for the worst in November 2013 during Jamieson's company trip to promote their wines.   Before the trip, Ms. Guzman had suffered an injury to her shoulder at work.  Whilst Ms. Guzman thought it would be in her best interest not to attend and allow her injury to heal, she was told that if she did not attend, she would no longer have her job and would be replaced.  Ms. Guzman had no intention of losing her job, so was forced to attend.

15.     As part of the trip, Jamieson rented a three-room home in the Big Sur mountains for its employees.  Ms. Guzman was the only African American on this trip.  She is also the only Jamieson employee that was not allowed to sleep in a bedroom.  Additionally, **SHE IS THE ONLY JAMIESON EMPLOYEE THAT WAS NOT ALLOWED TO SLEEP ON A BED!**

16.     Instead of allowing Ms. Guzman to sleep in a bedroom like her Caucasian co-workers, and instead of allowing her to sleep in a proper bed, she was required to sleep on a mattress, on the floor, underneath a pool table, next to the bathroom.  But for some reason, this was not degrading enough, or humiliating enough, for Jamieson.  This treatment was not yet severe enough for Jamieson to feel that Ms. Guzman was clear that she was beneath everyone else at Jamieson.  So while Ms. Guzman lay on the floor in an effort to go to sleep, her Caucasian co-worker mockingly quoted a line from the movie *The Help* and said: "You is smart.  You is kind.  You is important," making it clear that Ms. Guzman was nothing more than the help that deserved nothing more than to sleep without a mattress, on the floor, under a pool table, near the bathroom.

17.     And just like "the help," Ms. Guzman was required to cook all of the food for the event.  Ms. Guzman did the "heavy lifting" and performed her executive duties while being paid as only a

1   Sous Chef.  Ms. Guzman performed these duties without sufficient support, and while suffering
2   from a shoulder injury, including loading and unloading cases of wine and carrying them into the
3   hotels.  And just like "the help," Ms. Guzman's injuries were of no concern to Jamieson.  She was
4
5   instructed not to file a Workers' Compensation claim and apparently expected to suffer the pain
6   from her injury without medical treatment until December 2013.

7   18.      Ms. Guzman followed Jamieson's orders, and waited until December to file her Workers'
8   Compensation claim.  But instead of being able to heal and observe a qualified medical leave,
9   Jamieson continuously called her to return to work despite her pain and injuries.  Consequently,
10  Ms. Guzman did not observe adequate medical leave, so she needed to file another Workers'
11  Compensation claim for the same injured shoulder in late 2014.
12
13  19.      While Ms. Guzman observed a medical leave, various Jamieson employees constantly and
14  repeatedly called her to come into work.  In total, even though Ms. Guzman was still in great pain,
15  she only took a couple days off because the company kept harassing her to come back in.  Ms.
16  Guzman subsequently filed another Workers' Compensation claim in September or October of
17  2014, based upon this same right shoulder injury.

18  20.      Ms. Guzman made several complaints to Human Resources ("HR") about the treatment she
19  experienced at Jamieson since the start of her employment.  Ms. Guzman also reported complaints
20  on behalf of other staff who were discriminated at Jamieson, however, those complaints fell on
21  disinterested ears.
22

23  21.      In a strange turn of events, Jamieson decided to promote an unqualified Caucasian named
24  Mary Beth Salmieri to "oversee" the Culinary Department.  Salmieri is not a chef, she does not
25  have any culinary experience in a professional kitchen, and she holds nothing more than a wedding
26  planning certificate.  But for some reason, Jamieson believed her to be qualified to supervise Ms.
27  Guzman.
28

-6-

22.     Salmieri – in all of her wisdom and experience – then purported to want to implement a successful cheese and wine tasting program.  Salmieri was clueless about the details and particulars involved in pairing cheese and wine, and she was equally ignorant of the time and preparation needed to master such a program.

23.     Salmieri initially wanted this program to be ready by October 24, 2014.  Ms. Guzman, of course, would be the only person responsible for creating this program.  And she was required to do so while maintaining her other primary job duties.  Ms. Guzman worked on the cheese and wine pairings, at times, for almost eight hours each day.

24.     Salmieri then changed her mind and moved the date for the program from late October, to late September.  However, Salmieri was already aware that Ms. Guzman had pre-existing vacation plans scheduled between the end of September 2014 and the beginning of October 2014.  Salmeiri sprung this on Ms. Guzman at the last minute and required Ms. Guzman to change her vacation plans.

25.     During this time, Ms. Guzman had been working feverishly to complete the wine and cheese tasting program without any help.  Even still, Salmieri continued to schedule parties each weekend and required Ms. Guzman to take a lead role in the planning and execution of each party without sufficient support.  Ms. Guzman continued to work on the program, while also managing the weekend parties, up until her vacation.

26.     When Ms. Guzman returned from vacation on October 5, 2014 – two days earlier than initially scheduled – she was suspended the following day for failing to roll-out the cheese and wine tasting program.  Jamieson suspended Ms. Guzman for one week without pay.

27.     When Ms. Guzman returned from her suspension, Salmieri's next project was to harass Ms. Guzman about her work schedule.  Salmieri repeatedly harassed Ms. Guzman with subtle accusations and statements suggesting that she did not know what Ms. Guzman's work schedule

-7-

1  was, and insinuating that Ms. Guzman was not working when she otherwise should have been.

2  Salmieri then forced Ms. Guzman into a fixed schedule, which was very uncommon for Executive

3  Chefs. Salmieri also required Ms. Guzman to submit a weekly email to everyone at Jamieson

4  confirming her schedule for the week.

5

6  28.       During this time, Salmieri refused to provide Ms. Guzman with adequate support staff.

7  Instead, Ms. Guzman was required to wash dishes like a "bus boy," and to handle other entry level

8  duties that were not common for Executive Chefs. Salmieri also required Ms. Guzman to be "the

9  help" and cook for her co-workers during their lunch breaks. Ms. Guzman, however, was not

10 allowed to have a lunch break.

11 29.       At some point, Ms. Guzman was warned that the company wanted to get rid of the culinary

12 department. Salmieri told Ms. Guzman that she wanted to fight for the company to keep the

13 culinary department, but in order to do that, she needed to have control of her staff. Salmieri then

14 used this explanation to justify requiring Ms. Guzman – an Executive Chef – to report to the entire

15 winery what her schedule would be, and to work longer days than most Executive Chefs at

16 wineries.

17

18 30.       Salmieri seemed to also hide behind these alleged budget issues when requiring Ms.

19 Guzman to spend her own money on Jamieson's supplies. Jamieson cut-off Ms. Guzman's

20 company credit card and made Ms. Guzman spend her post-tax money on purchases needed for

21 Jamieson. Ms. Guzman often had hundreds of dollars in unpaid expenses, and it would take

22 Jamieson months to finally reimburse her.

23

24 31.       These sacrifices for Jamieson were clearly thankless. Jamieson fired Ms. Guzman on

25 January 7, 2015. For some reason, even though "the help" floated Jamieson's expenses, and

26 cooked for its employees, and worked tirelessly on half baked program ideas and weekly parties,

27 Ms. Guzman was told she was not the right fit for the culinary department, and that Jamieson was

28

-8-

1  going to eliminate its culinary department.

2  32.      In reality, Jamieson never really planned to eliminate its culinary department.  Jamieson

3  wanted to eliminate "the help" from its culinary department.  Jamieson hired a Caucasian male to

4  replace Ms. Guzman, gave him the title of Executive Chef, and paid him over $80,000 (with a

5  promise of over $100,000 when promoted to full time) annually for doing the same work that Ms.

6

7  Guzman had been doing.  Notably, however, he is required to work only 24 hours each week!

8  ### FIRST CAUSE OF ACTION

9  ### GENDER DISCRIMINATION (FEHA)

10  33.      Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 32, inclusive,

11  of this Complaint as though fully set forth herein.

12  34.      The Fair Employment and Housing Act (FEHA) (Govt. C. §12900) prevents employers

13  from discriminating against individuals on the basis of race, color, sex or national origin.

14

15  35.      Since the start of her employment, Plaintiff has been underpaid and overworked. Plaintiff's

16  qualifications and skills as a chef are extremely competitive and desirable in any kitchen.  She

17  graduated with honors from Le Cordon Bleu College of Culinary Arts and has worked as a chef for

18  several prestigious companies.  However, Brain Overhauser, a white male and the Executive Chef

19  at the time, forced Plaintiff to perform his Executive Chef duties while paying her only as a Sous

20  Chef.  Defendant subsequently fired Overhauser and then informed Plaintiff that she was being

21  given a "chef position" as a promotion. Defendant neither anointed her with the title of Executive

22  Chef, nor a salary commensurate with her skill and responsibility.  Instead, she was required to

23

24  continue performing Overhauser's job duties as an Executive Chef without enjoying the benefits

25  and title of an Executive Chef.  As such, Plaintiff was entitled to the same salary as her Caucasian

26  male predecessor.  Plaintiff was paid only $43,000 annually while her Caucasian male predecessor

27

28

-9-

1  was paid more than $100,000 annually.  This extreme disparity violates several state and federal

2  laws.

3  36.      Plaintiff who was qualified and trained on the job for the executive chef position was not

4  offered the opportunity to promote, however, other women at the winery who slept with the

5

6  president, Brian Gordon, were subsequently promoted to higher ranking positions even though they

7  did not have the qualifications.  Plaintiff did not engage in any such activities.

8  37.      As a proximate result of the wrongful conduct of Defendants, Plaintiff has sustained

9  substantial losses in earnings and other employment benefits in an amount according to proof at the

10  time of trial.  As a further proximate result of the wrongful conduct of Defendants, Plaintiff has

11  suffered and continues to suffer humiliation, embarrassment, emotional distress and mental anguish,

12  all to her damage in an amount according to proof at the time of trial

13

14  38.      In doing the acts herein alleged, Defendants acted with oppression, fraud, malice, and

15  conscious disregard of the rights of Plaintiff, and Plaintiff is therefore entitled to punitive damages

16  in an amount according to proof at the time of trial.

17  39.      Plaintiffs are entitled to costs and reasonable attorney's fees pursuant to Government Code

18  Section 12965(b).

19

20                          **SECOND CAUSE OF ACTION**

21                    **RACIAL HARASSMENT IN VIOLATION OF FEHA**

22  40.      Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 39, inclusive,

23  of this Complaint as though fully set forth herein.

24  41.      During the course of Plaintiff's employment, Defendants failed to prevent harassment

25  towards Plaintiff in violation of Government Code section 12940(k). Defendants committed

26  unlawful employment practices in violation of Government Code section 12940 et seq. by failing

27  to prevent the above-alleged acts of racial harassment and discrimination and by wholly failing to

28

-10-

PLAINTIFF'S COMPLAINT                                    CASE NO.

1  undertake any prompt and adequate investigation concerning Defendants' unlawful conduct, and

2  by failing to take any action in response to the unlawful conduct of Defendants.

3  42.     As described above, Plaintiff had to endure hearing racist comments regarding "Fucking

4  black people!" from the day she started working with Defendant and continuously received a

5
6  second class treatment throughout her tenure.   Not only did Plaintiff suffer from discrimination the

7  moment she started work, her Caucasian co-workers even mockingly quoted a line from the film

8  "The Help", showing clear racial harassment in the workplace for a significant period of time.

9  43.     As a proximate result of the wrongful conduct of Defendants, Plaintiff has sustained

10  substantial losses in earnings and other employment benefits in an amount according to proof. As a

11  further proximate result of the wrongful conduct of Defendants, Plaintiff has suffered and

12
13  continues to suffer humiliation, embarrassment, emotional distress and mental anguish, all to her

14  damage in an amount according to proof.

15  44.     In doing the acts herein alleged, Defendants acted with oppression, fraud, malice, and in

16  conscious disregard of the rights of Plaintiff, and Plaintiff is therefore entitled to punitive damages

17  in an amount according to proof at the time of trial.

18  45.     Plaintiff is entitled to costs and reasonable attorney's fees pursuant to Government Code

19  Section 12965(b).

20                              **THIRD CAUSE OF ACTION**

21
22                            **RACIAL DISCRIMINATION (FEHA)**

23  46.     Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 45, inclusive,

24  of this Complaint as though fully set forth herein.

25  47.     The Fair Employment and Housing Act (FEHA) (Govt. C. §12900) prevents employers

26  from discriminating against individuals on the basis of race, color or national origin.

27  48.     As described above, since the start of her employment, Plaintiff, an African-American

28
                                        -11-

employee, has been discriminated, harassed, publicly embarrassed, and humiliated by her employer and Caucasian co-workers.

49.     Although qualified, willing and able, to perform the duties and responsibilities of an Executive Chef, Plaintiff was passed over and labeled a "chef position" and continued to receive $43,000 annually for performing Executive Chef job duties without the $100,000 salary her Caucasian predecessor received in that position.  After rendering her tireless efforts in performing the Executive Chef role and other assignments added on with a fraction of the pay, Jamieson terminated Plaintiff and promoted another Caucasian male to replace her with the title of "Executive Chef" and $80,000 in part-time salary.  Plaintiff's salary was never increased and she was denied a bonus at the end of the year.  In fact, had Plaintiff been working on an hourly rate of $17, she would have earned more than her given salary of $43,000 due to the amount of work and overtime she had to perform.

50.     As a proximate result of the wrongful conduct of Defendants, Plaintiff has sustained substantial losses in earnings and other employment benefits in an amount according to proof at the time of trial.  As a further proximate result of the wrongful conduct of Defendants, Plaintiff has suffered and continues to suffer humiliation, embarrassment, emotional distress and mental anguish, all to her damage in an amount according to proof at the time of trial.

51.     In doing the acts herein alleged, Defendants acted with oppression, fraud, malice, and conscious disregard of the rights of Plaintiff, and Plaintiff is therefore entitled to punitive damages in an amount according to proof at the time of trial.

52.     Plaintiffs are entitled to costs and reasonable attorney's fees pursuant to Government Code Section 12965(b).

///

///

-12-

## FOURTH CAUSE OF ACTION

## DISABILITY DISCRIMINATION (FEHA)

53.     Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 52, inclusive, of this Complaint as though fully set forth herein.

54.     As described above when Plaintiff suffered from a shoulder injury, Defendants failed to provide her with adequate medical leave and accommodations to recover.  In addition, Plaintiff was instructed not to file a Worker's Compensation claim and thus was forced to continue working, lifting heavy loads, whilst she continued to suffer the pain from her injury without medical treatment.

55.     As a proximate result of the wrongful conduct of Defendants, Plaintiff has sustained substantial losses in earnings and other employment benefits in an amount according to proof at the time of trial.  As a further proximate result of the wrongful conduct of Defendants, Plaintiff has suffered and continues to suffer humiliation, embarrassment, emotional distress and mental anguish, all to her damage in an amount according to proof at the time of trial.

56.     In doing the acts herein alleged, Defendants acted with oppression, fraud, malice, and in the conscious disregard of the rights of Plaintiff, and Plaintiff is therefore entitled to punitive damages in an amount according to proof at the time of trial.

57.     Plaintiff is entitled to costs and reasonable attorney's fees pursuant to Government Code Section 12965(b).

## FIFTH CAUSE OF ACTION

## RETALIATION (FEHA)

58.     Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 57, inclusive, of this Complaint as though fully set forth herein.

///

-13-

59.     Plaintiff reported the harassing incidents but no notice was taken.  She voiced her concerns and that of others, but things got worse.  As a result of the hostile work environment and how Defendant saw Plaintiff, she continued to be a victim of retaliation.  Defendant failed to provide Plaintiff with a retaliation free environment.

60.     Based on the above-alleged conduct, Defendants retaliated against Plaintiff for opposing and reporting race and disability-related harassment in violation of California Government Code § 12940(h).

61.     As a direct and proximate result of Defendant's conduct, Plaintiff has suffered special damages in the form of lost earnings, benefits and/or out-of-pocket expenses in an amount according to proof.  As a further direct and proximate result of Defendants' conduct, Plaintiff will suffer additional special damages in the form of lost future earnings, benefits and/or other prospective damages in an amount according to proof.

62.     As a further proximate result of the wrongful conduct of Defendants, Plaintiff has suffered and continues to suffer humiliation, lack of self-confidence, embarrassment, emotional distress and mental anguish, all to her damage in an amount according to proof at the time of trial.

63.     In doing the acts herein alleged, Defendants acted with oppression, fraud, malice, and in the conscious disregard of the rights of Plaintiff, and Plaintiff is therefore entitled to punitive damages in an amount according to proof.

64.     Plaintiff is entitled to costs and reasonable attorney's fees pursuant to Government Code Section 12965(b).

## SIXTH CAUSE OF ACTION

## RETALIATION AND HARASSMENT (CFRA)

65.     Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 64, inclusive, of this Complaint as though fully set forth herein.

-14-

PLAINTIFF'S COMPLAINT                                    CASE NO.

66.    As described above, Plaintiff was forced to work when she had an injury sustained at work. She was not provided with any support nor was she given reasonable accommodations to perform her duties in a manner that would not endanger her health or safety.

67.    As a result of the hostile work environment and how Defendant saw Plaintiff, she continued to be a victim of harassment and retaliation.  She reported all the incidents but no notice was taken. The work environment was not free from harassment as Defendant had a running joke and referred to Plaintiff merely as "the Help" and nothing more.

68.    Based on the above-alleged conduct, Defendants retaliated against Plaintiff for opposing and reporting race and disability-related harassment in violation of California Government Code §12940(h) *et seq.* and (j).

69.    As a direct and proximate result of Defendant's conduct, Plaintiff has suffered special damages in the form of lost earnings, benefits and/or out-of-pocket expenses in an amount according to proof.  As a further direct and proximate result of Defendant's conduct, Plaintiff will suffer additional special damages in the form of lost future earnings, benefits and/or other prospective damages in an amount according to proof.

70.    As a further proximate result of the wrongful conduct of Defendants, Plaintiff has suffered and continues to suffer humiliation, embarrassment, emotional distress and mental anguish, all to her damage in an amount according to proof at trial.

71.    In doing the acts herein alleged, Defendants acted with oppression, fraud, malice, and in the conscious disregard of the rights of Plaintiff, and Plaintiff is therefore entitled to punitive damages in an amount according to proof.

72.    Plaintiff is entitled to costs and reasonable attorney's fees pursuant to Government Code Section 12965(b).

///

-15-

PLAINTIFF'S COMPLAINT                                                    CASE NO.

## SEVENTH CAUSE OF ACTION

## WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

73.     Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 72, inclusive, of this Complaint as though fully set forth herein.

74.     Plaintiff was terminated in violation of public policy.  Plaintiff was required to continuously use her own money to pay for Defendant's supplies on various occasions, whilst not being reimbursed until several months later.  Plaintiff was continuously harassed about her work schedule and asked to come in and do jobs that were not part of her job description and asked to work when she had an ongoing injury.  Plaintiff was subsequently terminated under the guise of Jamieson eliminating its culinary department, which was not the case at all!

75.     Defendant wrongfully terminated Plaintiff's employment, and did so in Violation of Public Policy.

76.     As a proximate result of the wrongful conduct of Defendants, Plaintiff has suffered special damages in the form of lost earnings, benefits and/or out-of-pocket expenses and other employment benefits in an amount according to proof at the time of trial.  As a further proximate result of the wrongful conduct of Defendants, Plaintiff has suffered and continues to suffer humiliation, embarrassment, emotional distress and mental anguish, all to her damage in an amount according to proof at the time of trial

77.     In doing the acts herein alleged, Defendants acted with oppression, fraud, malice, and conscious disregard of the rights of Plaintiff, and Plaintiff is therefore entitled to punitive damages in an amount according to proof at the time of trial.

78.     Plaintiffs are entitled to costs and reasonable attorney's fees pursuant to Government Code Section 12965(b).

///

-16-

PLAINTIFF'S COMPLAINT                                                      CASE NO.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays for judgment against Defendants, and each of them, according to proof, as follows:

a.  For general, consequential and special damages, including lost wages, in a sum in excess of the minimum jurisdictional limit of this Court, according to proof at trial;

b.  For interest at the maximum legal rate;

c.  For punitive damages;

d.  For reasonable attorney's fees;

e.  For costs of suit incurred herein; and

f.  For such other and further relief as the Court may deem just and proper.

DATED: December 21, 2015

LAW OFFICES OF JOHN L. BURRIS

By: _____
    NA'IL BENJAMIN, ESQ.
    ANN M. KARIUKI, ESQ.
    Attorney for Plaintiff
    CARMEN GUZMAN

**DEMAND FOR JURY TRIAL**

Plaintiff hereby requests a jury trial on the claims so triable.

DATED: December 21, 2015

BENJAMIN LAW GROUP

By: _____
    NA'IL BENJAMIN, ESQ.
    ANN M. KARIUKI, ESQ.
    Attorney for Plaintiffs
    CARMEN GUZMAN

-17-

PLAINTIFF'S COMPLAINT                                          CASE NO.



# Superior Court of California, County of Alameda
## Alternative Dispute Resolution (ADR) Information Packet

The person who files a civil lawsuit (plaintiff) must include the ADR Information Packet with the complaint when serving the defendant. Cross complainants must serve the ADR Information Packet on any new parties named to the action.

> The Court *strongly encourages* the parties to use some form of ADR before proceeding to trial.  You may choose ADR by:
>
> - Indicating your preference on Case Management Form CM-110;
>
> - Filing the Stipulation to ADR and Delay Initial Case Management Conference for 90 Days (a local form included with the information packet); or
>
> - Agree to ADR at your Initial Case Management Conference.
>
> **QUESTIONS?**  Call (510) 891-6055. Email adrprogram@alameda.courts.ca.gov
> Or visit the court's website at http://www.alameda.courts.ca.gov/adr

### What Are The Advantages Of Using ADR?

- *Faster* —Litigation can take years to complete but ADR usually takes weeks or months.

- *Cheaper* – Parties can save on attorneys' fees and litigation costs.

- *More control and flexibility* – Parties choose the ADR process appropriate for their case.

- *Cooperative and less stressful* – In mediation, parties cooperate to find a mutually agreeable resolution.

- *Preserve Relationships* – A mediator can help you effectively communicate your interests and point of view to the other side. This is an important benefit when you want to preserve a relationship.

### What Is The Disadvantage Of Using ADR?

- *You may go to court anyway* – If you cannot resolve your dispute using ADR, you may still have to spend time and money resolving your lawsuit through the courts.

### What ADR Options Are Available?

- *Mediation* – A neutral person (mediator) helps the parties communicate, clarify facts, identify legal issues, explore settlement options, and agree on a solution that is acceptable to all sides.

  o **Court Mediation Program:** Mediators do not charge fees for the first two hours of mediation.  If parties need more time, they must pay the mediator's regular fees.

Some mediators ask for a deposit before mediation starts which is subject to a refund for unused time.

- o **Private Mediation:** This is mediation where the parties pay the mediator's regular fees and may choose a mediator outside the court's panel.

- *Arbitration* – A neutral person (arbitrator) hears arguments and evidence from each side and then decides the outcome of the dispute. Arbitration is less formal than a trial and the rules of evidence are often relaxed. Arbitration is effective when the parties want someone other than themselves to decide the outcome.

- o **Judicial Arbitration Program (non-binding):** The judge can refer a case or the parties can agree to use judicial arbitration. The parties select an arbitrator from a list provided by the court. If the parties cannot agree on an arbitrator, one will be assigned by the court. There is no fee for the arbitrator. The arbitrator must send the decision (award of the arbitrator) to the court. The parties have the right to reject the award and proceed to trial.

- o **Private Arbitration (binding and non-binding)** occurs when parties involved in a dispute either agree or are contractually obligated. This option takes place outside of the courts and is normally binding meaning the arbitrator's decision is final.

## Mediation Service Programs In Alameda County

Low cost mediation services are available through non-profit community organizations. Trained volunteer mediators provide these services. Contact the following organizations for more information:

**SEEDS Community Resolution Center**
2530 San Pablo Avenue, Suite A, Berkeley, CA 94702-1612
Telephone: (510) 548-2377     Website: www.seedscrc.org
Their mission is to provide mediation, facilitation, training and education programs in our diverse communities – Services that Encourage Effective Dialogue and Solution-making.

**Center for Community Dispute Settlement**
291 McLeod Street, Livermore, CA 94550
Telephone: (925) 373-1035     Website: www.trivalleymediation.com
CCDS provides services in the Tri-Valley area for all of Alameda County.

*For Victim/Offender Restorative Justice Services*
**Catholic Charities of the East Bay: Oakland**
433 Jefferson Street, Oakland, CA 94607
Telephone: (510) 768-3100     Website: www.cceb.org
Mediation sessions involve the youth, victim, and family members work toward a mutually agreeable restitution agreement.

ALA ADR-001

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)* | FOR COURT USE ONLY |
|---|---|
| TELEPHONE NO.                                    FAX NO. *(Optional)* | |
| E-MAIL ADDRESS *(Optional)*: | |
| ATTORNEY FOR *(Name)*: | |

**SUPERIOR COURT OF CALIFORNIA, ALAMEDA COUNTY**
STREET ADDRESS:
MAILING ADDRESS:
CITY AND ZIP CODE:
BRANCH NAME:

PLAINTIFF/PETITIONER:

DEFENDANT/RESPONDENT:

| **STIPULATION TO ATTEND ALTERNATIVE DISPUTE RESOLUTION (ADR) AND DELAY INITIAL CASE MANAGEMENT CONFERENCE FOR 90 DAYS** | CASE NUMBER |
|---|---|

**INSTRUCTIONS: All applicable boxes must be checked, and the specified information must be provided.**

This stipulation is effective when:

- All parties have signed and filed this stipulation with the Case Management Conference Statement at least 15 days before the initial case management conference.
- A copy of this stipulation has been received by the ADR Program Administrator, 1225 Fallon Street, Oakland, CA 94612.

1. Date complaint filed: _____. An Initial Case Management Conference is scheduled for:

   Date:                         Time:                        Department:

2. Counsel and all parties certify they have met and conferred and have selected the following ADR process *(check one)*:

   ☐ Court mediation          ☐ Judicial arbitration
   ☐ Private mediation        ☐ Private arbitration

3. All parties agree to complete ADR within 90 days and certify that:

   a. No party to the case has requested a complex civil litigation determination hearing;
   b. All parties have been served and intend to submit to the jurisdiction of the court;
   c. All parties have agreed to a specific plan for sufficient discovery to make the ADR process meaningful;
   d. Copies of this stipulation and self-addressed stamped envelopes are provided for returning endorsed filed stamped copies to counsel and all parties;
   e. Case management statements are submitted with this stipulation;
   f. All parties will attend ADR conferences; and,
   g. The court will not allow more than 90 days to complete ADR.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

_____        ▶ _____
(TYPE OR PRINT NAME)                          (SIGNATURE OF PLAINTIFF)


Date:

_____        ▶ _____
(TYPE OR PRINT NAME)                          (SIGNATURE OF ATTORNEY FOR PLAINTIFF)

| Form Approved for Mandatory Use<br>Superior Court of California,<br>County of Alameda<br>ALA ADR-001 [New January 1, 2010] | **STIPULATION TO ATTEND ALTERNATIVE DISPUTE RESOLUTION (ADR) AND DELAY INITIAL CASE MANAGEMENT CONFERENCE FOR 90 DAYS** | Cal. Rules of Court,<br>rule 3.221(a)(4) |
|---|---|---|

ALA ADR-001

| PLAINTIFF/PETITIONER: | CASE NUMBER.: |
|---|---|
| DEFENDANT/RESPONDENT: | |

Date

_____        ▶ _____
(TYPE OR PRINT NAME)                         (SIGNATURE OF DEFENDANT)

Date:

_____        ▶ _____
(TYPE OR PRINT NAME)                         (SIGNATURE OF ATTORNEY FOR DEFENDANT)

Form Approved for Mandatory Use
Superior Court of California,
County of Alameda
ALA ADR-001 [New January 1, 2010]

**STIPULATION TO ATTEND ALTERNATIVE DISPUTE RESOLUTION (ADR)
AND DELAY INITIAL CASE MANAGEMENT CONFERENCE FOR 90 DAYS**

Cal. Rules of Court,
rule 3.221(a)(4)

```
Benjamin Law Group PC
Attn: Kariuki, Ann M.
505 - 14th St.
Suite 900
Oakland, CA   94612____
```

## Superior Court of California, County of Alameda

| | |
|---|---|
| Guzman | No. RG15797471 |
|                              Plaintiff/Petitioner(s) | **NOTICE OF CASE MANAGEMENT** |
|         vs. | **CONFERENCE AND ORDER** |
| Madison Vineyard Holdings, LLC | Unlimited Jurisdiction |
|                             Defendant/Respondent(s) | |
|                 (Abbreviated Title) | |

TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

Notice is given that a Case Management Conference has been scheduled as follows:

| | | |
|---|---|---|
| Date: 05/05/2016 | Department: 509 | Judge: Stephen Pulido |
| Time: 03:00 PM | Location: Hayward Hall of Justice | Clerk: Kasha Clarke |
| | 2nd Floor | Clerk telephone: (510) 690-2718 |
| | 24405 Amador Street, Hayward  CA 94544 | E-mail: |
| | | Dept.509@alameda.courts.ca.gov |
| | Internet: www.alameda.courts.ca.gov | Fax: (510) 267-1583 |

### ORDERS

1. **Plaintiff must:**

    a.  Serve all named defendants and file proofs of service on those defendants with the court within 60 days of the filing of the complaint (Cal. Rules of Court, 3.110(b)); and

    b.  Give notice of this conference to all other parties and file proof of service.

2. **Defendant must respond as stated on the summons.**

3. **All parties who have appeared before the date of the conference must:**

    a.  Meet and confer, in person or by telephone as required by Cal. Rules of Court, rule 3.724;

    b.  File and serve a completed *Case Management Statement* on Form CM-110 at least 15 days before the Case Management Conference (Cal. Rules of Court, rule 3.725); and

    c.  Post jury fees as required by Code of Civil Procedure section 631.

4.  If you do not follow the orders above, the court may issue an order to show cause why you should not be sanctioned under Cal. Rules of Court, rule 2.30.  Sanctions may include monetary sanctions, striking pleadings or dismissal of the action.

5.  You are further ordered to appear in person or through your attorney of record at the Case Management Conference noticed above.  You must be thoroughly familiar with the case and fully authorized to proceed.  You may be able to appear at Case Management Conferences by telephone.  Contact CourtCall, an independent vendor, at least three business days before the scheduled conference.  Call 1-888-882-6878, or fax a service request to (888) 882-2946.  The vendor charges for this service.

6.  You may file *Case Management Conference Statements* by E-Delivery.  Submit them directly to the E-Delivery Fax Number (510) 267-5732.  No fee is charged for this service.  For further information, go to *www.alameda.courts.ca.gov/ff*.

7.  The judge may place a *Tentative Case Management Order* in your case's on-line register of actions before the conference.  This order may establish a discovery schedule, set a trial date or refer the case to Alternate Dispute Resolution, such as mediation or arbitration.  Check the website of each assigned department for procedures regarding tentative case management orders at *www.alameda.courts.ca.gov/dc*.

**CLERK'S CERTIFICATE OF MAILING**

I certify that the following is true and correct: I am the clerk of the above-named court and not a party to this cause. I served this Notice of Hearing by placing copies in envelopes addressed as shown hereon and then by sealing and placing them for collection, stamping or metering with prepaid postage, and mailing on the date stated below, in the United States mail at Alameda County, California, following standard court practices.

Executed on 12/23/2015.

By *Cheryl Clark*

Digital

_____
Deputy Clerk

## Superior Court of California, County of Alameda



## Notice of Assignment of Judge for All Purposes

Case Number: RG15797471
Case Title:   Guzman VS Madison Vineyard Holdings, LLC
Date of Filing: 12/21/2015

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

Pursuant to Rule 3.734 of the California Rules of Court and Title 3 Chapter 2 of the
Local Rules of the Superior Court of California, County of Alameda, this action is
hereby assigned by the Presiding Judge for all purposes to:

| | |
|---|---|
| Judge: | Stephen Pulido |
| Department: | 509 |
| Address: | Hayward Hall of Justice |
| | 24405 Amador Street |
| | Hayward  CA  94544 |
| Phone Number: | (510) 690-2718 |
| Fax Number: | (510) 267-1583 |
| Email Address: | Dept.509@alameda.courts.ca.gov |

Under direct calendaring, this case is assigned to a single judge for all purposes including
trial.

Please note: In this case, any challenge pursuant to Code of Civil Procedure section
170.6 must be exercised within the time period provided by law.  (See Code Civ. Proc.
§§ 170.6, subd. (a)(2) and 1013.)

NOTICE OF NONAVAILABILITY OF COURT REPORTERS: Effective June 4, 2012, the
court will not provide a court reporter for civil law and motion hearings, any other hearing or
trial in civil departments, or any afternoon hearing in Department 201 (probate). Parties may
arrange and pay for the attendance of a certified shorthand reporter. In limited jurisdiction
cases, parties may request electronic recording.

Amended Local Rule 3.95 states: "Except as otherwise required by law, in general civil case
and probate departments, the services of an official court reporter are not normally
available. For civil trials, each party must serve and file a statement before the trial date
indicating whether the party requests the presence of an official court reporter."

IT IS THE DUTY OF EACH PLAINTIFF AND CROSS COMPLAINANT TO SERVE A COPY
OF THIS NOTICE IN ACCORDANCE WITH LOCAL RULES.

**General Procedures**

Following assignment of a civil case to a specific department, all pleadings, papers, forms, documents and writings can be submitted for filing at either Civil Clerk's Office, located at the René C. Davidson Courthouse, Room 109, 1225 Fallon Street, Oakland, California, 94612 or the Hayward Hall of Justice, 24405 Amador Street, Hayward, California, 94544. All documents, with the exception of the original summons and the original civil complaint, shall have clearly typed on the face page of each document, under the case number, the following:

ASSIGNED FOR ALL PURPOSES TO
JUDGE Stephen Pulido
DEPARTMENT 509

All parties are expected to know and comply with the Local Rules of this Court, which are available on the Court's website at: http://www.alameda.courts.ca.gov/courts/rules/index.shtml and with the California Rules of Court, which are available at www.courtinfo.ca.gov.

Parties must meet and confer to discuss the effective use of mediation or other alternative dispute processes (ADR) prior to the Initial Case Management Conference. The court encourages parties to file a "Stipulation to Attend ADR and Delay Initial Case Management Conference for 90 Days". Plaintiff received that form in the ADR information package at the time the complaint was filed. The court's Web site also contains this form and other ADR information. If the parties do not stipulate to attend ADR, the parties must be prepared to discuss referral to ADR at the Initial Case Management Conference.

Counsel are expected to be familiar and comply with the Statement of Professionalism and Civility, Alameda County Bar Association. www.acbanet.org. Appearances by attorneys who are not counsel of record are not permitted except for good cause. Failure to anticipate a non-emergency scheduling conflict is not good cause.

All references to "counsel" in this Order apply equally to self-represented litigants. The Court maintains Self-Help Services at 1225 Fallon Street, Room 250, Oakland, CA and 24405 Amador Street, Hayward, CA (510) 272-1393.

Courtesy copies of all moving, opposition and reply papers should be delivered directly to Dept. 509 at the Hayward Hall of Justice, 24405 Amador Street, Hayward.

**Schedule for Department 509**

The following scheduling information is subject to change at any time, without notice. Please contact the department at the phone number or email address noted above if you have questions.

- Trials generally are held: Mondays through Thursdays, beginning at 8:30 a.m. and concluding at 1:30 p.m.

- Case Management Conferences are held: Mondays, Tuesdays and Thursdays at 3:00 p.m. Timely filed and complete case management conference statements are mandatory in all cases.

- Law and Motion matters are heard: Tuesdays and Thursdays at 3:00 p.m.

- Settlement Conferences are heard: Friday mornings. The time will be determined by the Court in coordination with the parties.

- Pre-Trial Readiness conferences take place at 1:30 p.m. on Fridays.

## CLERK'S CERTIFICATE OF MAILING

I certify that the following is true and correct:  I am the clerk of the above-named court and not a party to this cause.  I served this Notice by placing copies in envelopes addressed as shown on the attached Notice of Initial Case Management Conference and then by sealing and placing them for collection, stamping or metering with prepaid postage, and mailing on the date stated below, in the United States mail at Alameda County, California, following standard court practices.

Executed on 12/23/2015

By

_Cheryl Clark_

Digital

_____
Deputy Clerk